# 24-2555

## United States Court of Appeals
### for the Second Circuit

JAMES HARKER,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC., ASSOCIATION OF INDEPENDENT COMMERCIAL PRODUCERS, INC., SOMETHING IDEAL, LLC, DBA M SS NG P ECES, BBDO WORLDWIDE, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Southern District of New York, No. 1:23-cv-7865 (Hon. Laura Taylor Swain)

## BRIEF FOR NON-EMPLOYER DEFENDANTS-APPELLEES

Guy Cohen
DAVIS+GILBERT LLP
1675 Broadway
New York, NY 10019
(212) 468-4853
*Counsel for Defendant-Appellee*
*BBDO Worldwide, Inc.*

Paul P. Rooney
ELLENOFF GROSSMAN & SCHOLE LLP
1345 Avenue of the Americas, 11th Floor
New York, NY 10105
(212) 370-1300
*Counsel for Defendant-Appellee*
*Association of Independent*
*Commercial Producers, Inc.*

February 4, 2025

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com

Danielle Conley
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004

Melanie M. Blunschi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

*Counsel for Defendant-Appellee*
*Meta Platforms, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Meta Platforms, Inc. states that it has no parent corporation and that no publicly held company owns 10% or more of its stock.

Defendant-Appellee Association of Independent Commercial Producers, Inc. states that it has no parent corporation and that no publicly held company owns 10% or more of its stock.

Defendant-Appellee BBDO Worldwide, Inc. states that it is a wholly owned subsidiary of Omnicom Group Inc., a publicly held company.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...................................................................1

ISSUE PRESENTED FOR REVIEW ..................................................4

STATEMENT OF THE CASE ..................................................................4

    A.    Factual Background..................................................................4

        1.    The DTL Program ........................................................4

        2.    The Commercial..................................................5

        3.    Harker's Extensive Experience In The Industry.........................7

    B.    Procedural Background ........................................................8

SUMMARY OF ARGUMENT ................................................................11

STANDARD OF REVIEW ..................................................................14

ARGUMENT ...................................................................14

I.    HARKER FAILS TO ALLEGE HE APPLIED FOR A GAFFER POSITION ..................................................................16

    A.    Harker Does Not Allege He Ever Expressed Any Interest In A Gaffer Position To Any Defendant, Much Less Applied For One ..................................................................16

    B.    Harker's Attempts To Invoke Narrow Exceptions To The Application Requirement Fail ..........................................20

II.    HARKER FAILS TO ALLEGE HE WAS QUALIFIED FOR THE DTL POSITION ..................................................................31

III.    HARKER HAS NO STANDING TO SEEK PROSPECTIVE INJUNCTIVE RELIEF ..................................................................35

CONCLUSION ..................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abadi v. City of New York*,
No. 22-1560-cv, 2023 WL 3295949 (2d Cir. May 8, 2023),
*cert. denied*, 144 S. Ct. 260 (2023).....................................................16

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ................................................................20

*Beebe v. New York Times Co.*,
666 F. Supp. 2d 321 (E.D.N.Y. 2009) ..........................................12, 19

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024) .............12, 16

*Brown v. Coach Stores*,
163 F.3d 706 (2d Cir. 1998) ...........................................................24, 25

*Carney v. Adams*,
592 U.S. 53 (2020).....................................................................*passim*

*Errato v. Seder*,
No. 23-638, 2024 WL 726880 (2d Cir. Feb. 22, 2024).....................................36

*Faculty, Alumni, & Students Opposed to Racial Preferences v. New York University*,
11 F.4th 68 (2d Cir. 2021) ...................................................15, 18, 35

*HealthNow New York Inc. v. New York*,
448 F. App'x 79 (2d Cir. 2011) ..........................................................35

*Houser v. Pritzker*,
28 F. Supp. 3d 222 (S.D.N.Y. 2014) .............................................3, 31

*Ighani v. City of Hartford*,
No. 09-cv-2111, 2012 WL 3728025 (D. Conn. Jan. 4, 2012)...........................27

*International Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977).....................................................................21, 22

**Page(s)**

*Jackson-Bey v. Hanslmaier*,
    115 F.3d 1091 (2d Cir. 1997) ................................................................16

*Jean-Gilles v. Rockland County*,
    No. 20-cv-1999, 2024 WL 1348791 (S.D.N.Y. Mar. 29, 2024) .................27, 28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................35

*Melendez v. Illinois Bell Telephone Co.*,
    79 F.3d 661 (7th Cir. 1996) ...................................................3, 13, 31

*Mitchell v. Planned Parenthood of Greater New York, Inc.*,
    No. 23-cv-01932, 2024 WL 3849192 (S.D.N.Y. Aug. 16, 2024) .....................16

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972)..............................................................................16

*Morrison v. National Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010)..............................4, 14

*Newark Branch, NAACP v. Town of Harrison*,
    907 F.2d 1408 (3d Cir. 1990) .............................................................22, 23

*O'Brien v. National Property Analysts Partners*,
    719 F. Supp. 222 (S.D.N.Y. 1989) ..........................................................28

*Opoku v. Brega*,
    No. 15-CV-2213, 2016 WL 5720807 (S.D.N.Y. Sept. 30, 2016) .....................30

*Petrosino v. Bell Atl.*,
    385 F.3d 210 (2d Cir. 2004) .......................................................*passim*

*Rich v. Associated Brands Inc.*,
    559 F. App'x 67 (2d Cir. 2014) ...............................................................24

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009)..............................................................................36

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................15, 34

**Page(s)**

*Trustees of the Upstate New York Engineers Pension Fund v.*
*Ivy Asset Management,*
843 F.3d 561 (2d Cir. 2016) ...............................................................14

*United States v. Gregory,*
871 F.2d 1239 (4th Cir. 1989) ...........................................................22

*Velez v. Janssen Ortho, LLC,*
467 F.3d 802 (1st Cir. 2006) ..............................................................30

*Wong v. Kings County District Attorney's Office,*
No. 02 CV 3740, 2004 WL 692165 (E.D.N.Y. Mar. 31, 2004) ........................20

# INTRODUCTION

This case involves a textbook example of "an abstract and generalized" grievance that does not give rise to standing. *Carney v. Adams*, 592 U.S. 53, 58 (2020). In a straightforward and well-reasoned decision, the District Court rejected Plaintiff James Harker's claims for failure to plead standing, on multiple independent grounds. That sound decision faithfully applies this Court's precedent, and should be affirmed.

Harker seeks to challenge the Double the Line ("DTL") Program, which is an apprenticeship program that allows Black, Indigenous, and People of Color ("BIPOC") crew members who have minimal experience in the commercial production industry to serve as apprentices to seasoned crew members, thereby gaining exposure and access to positions they have not worked in before. Harker, a 27-year veteran of the commercial production industry, contends that he was injured because he was not hired as a "gaffer" (i.e., lead electrician) on a specific commercial as part of this apprenticeship program. Harker does not allege that he ever applied for a gaffer role on that commercial or even registered any interest in the position. Nor does Harker explain how, as a crew member with nearly three decades of experience, he would have been qualified for a program designed for inexperienced individuals who lack exposure to the industry and need apprenticeship training. Instead, Harker claims injury (and seeks damages) based solely on his proffer that,

1

had he been aware of the DTL gaffer position, he would have sought it—a theory of standing that would expose employers to damages claims from essentially anyone who might hypothetically apply for a job.

Moreover, Harker's standing theory is even *broader* than that, because he sued not just his employer, the production company Something Ideal, LLC ("Something Ideal"), but also three other defendants: (1) Meta Platforms, Inc. ("Meta"), for whom the commercial was being made; (2) BBDO Worldwide, Inc. ("BBDO"), the advertising agency for the commercial; and (3) the Association of Independent Commercial Producers, Inc. ("AICP"), a trade industry group that encouraged its members to adopt the DTL Program (collectively, the "Non-Employer Defendants"). Harker admits that he "has never been employed" by any of these three defendants and that they had no role in the hiring process for the commercial. A18, 23, 31 (¶¶ 40-42, 83-85, 137-38). Nevertheless, Harker also seeks to sue them for their failure to somehow divine he wanted a gaffer role on the commercial and intervene with his employer, Something Ideal, to ensure he was offered that role.

The District Court correctly dismissed Harker's complaint for lack of Article III standing on two independent grounds. *First*, as the District Court explained, Harker has not pled a concrete injury because he does not allege that he "applied or otherwise expressed his interested in" a gaffer position, whether under the DTL

Program or otherwise.  A57-58.  Harker thus seeks to hold Defendants liable for failing to reach out and affirmatively offer him a job he had never even expressed interest in.  No case has ever recognized such a broad theory of standing, under which a defendant could be liable to anyone who had an unspoken interest in a position.  The District Court's decision can be affirmed on that ground alone.

*Second,* the District Court concluded that Harker also lacked an Article III injury because he was not qualified for a DTL role.  The DTL Program is designed to function as an apprenticeship program for people who "have not previously had access to the commercial production business."  A59 (quoting A16 (¶ 30)) (alterations omitted).  As the District Court explained, Harker offers no "indication as to why, as an industry veteran with twenty-seven years of experience," he would be qualified to participate in that program.  *Id.*; *see Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996); *Houser v. Pritzker*, 28 F. Supp. 3d 222, 236-37 (S.D.N.Y. 2014) (collecting cases).

On appeal, Harker largely restates the same meritless arguments that the District Court rejected.  He claims that this Court's decision in *Petrosino v. Bell Atlantic* endorses his unlimited view of standing, but, as the District Court correctly held, that "narrow" exception is inapplicable here for a host of reasons.  385 F.3d 210, 227 (2d Cir. 2004).  He further disparages the District Court for "refus[ing] to accept all material factual allegations in the amended complaint as true, and

declin[ing] to draw reasonable inferences in Harker's favor." Appellant's Br. 13. But the District Court expressly acknowledged that it "must accept all factual allegations pled in the complaint as true," A56, and it followed that command throughout its decision. At the same time, the Court correctly recognized that, under this Court's precedent, "jurisdiction must be shown affirmatively" at the Rule 12(b)(1) stage—a showing that Harker did not and cannot make with respect to either the application or the qualification requirements. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted), *aff'd*, 561 U.S. 247 (2010); *see* A60 (citing *Morrison*). Simply put, the District Court correctly applied this Court's well-settled precedent and Harker offers no reason to disturb that sound decision on appeal.

## ISSUE PRESENTED FOR REVIEW

Whether the District Court correctly held that Harker lacked standing to challenge his failure to be hired as a DTL gaffer when he did not allege he applied for or even expressed a concrete intent to seek a gaffer position or allege facts showing he was qualified for the DTL gaffer position.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. The DTL Program

As an industry that depends heavily on interpersonal relationships and

networking, the commercial production industry is notoriously hard to break into. AICP promoted the DTL Program to address these barriers and "increase diversity" among commercial production crew members. A14, 15 (¶¶ 21, 24, 27) (citation omitted).

The DTL Program works by "doubl[ing]" the "line" on a production's budget for a specific position to permit a second person to "work alongside" the first "in a paid capacity" and thereby gain access to the industry. A14, 16 (¶¶ 22, 30) (citations omitted); *see also* A15-16 (¶¶ 26, 28). Under the DTL Program, rather than hiring just one cameraman, casting director, or costume designer, a production company hires two: one who is experienced in the industry and one who is not. "The idea is to pick one line" on the budget "that allows a candidate who has not previously had access to [the] business" to "learn the nuances around commercial production in a real, hands on way." A16 (¶ 30) (citation omitted). As AICP describes it, the "goal" of the DTL Program is "to invest in the building of careers and apprenticeship training over a period of several jobs to ensure the needed experience is received." A24 (¶ 93).

## 2. The Commercial

This lawsuit is based on the hiring process for a single Meta commercial that was made on December 14, 2022. *See* A18-24 (¶¶ 40-89). Harker alleges that Meta worked with BBDO, an advertising agency, and Something Ideal, a production

company, to make the commercial while implementing AICP's DTL Program. A24, 25 (¶¶ 92, 97, 100).

According to Harker, on December 12, 2022, the production supervisor for the commercial emailed him and "offered [him] a position as Best Boy Electrician" on behalf of Something Ideal. A18 (¶¶ 40, 42). The best boy is the second-most senior electrician with "supervisory duties over the other electricians." A17 (¶ 35). The best boy "reports to the gaffer," who is "the most senior or highest-level electrician on a production." *Id.* Harker alleges that Something Ideal's production supervisor did "not offer[]" him a gaffer position, but he also admits that he "did not apply for" one. A18-19 (¶¶ 41, 43).

Something Ideal hired two other people to serve as gaffers on the commercial: one experienced electrician and one DTL hire. A19 (¶ 46). Harker alleges that the DTL gaffer "lacked experience as a gaffer," had "virtually no experience as an electrician," and had "limited knowledge of the electrical equipment and work practices on set." A19 (¶¶ 47, 50); *see also* A20 (¶ 58). Harker further alleges that although the DTL gaffer lacked experience, she "was compensated more than" him because gaffers are paid more than best boys. A19 (¶ 49).

According to Harker, there were a total of nine DTL hires on the commercial. A20 (¶ 54). Harker's impression is that three of them were experienced in their

positions.  A21-22 (¶ 59-76).  Harker makes no allegations as to the qualifications or experience of the other five DTL hires.

Harker does not allege that Meta, AICP, or BBDO had any involvement in the hiring process for the DTL gaffer, non-DTL gaffer, or his own position of best boy. He admits that he "has never been employed" by Meta, AICP, or BBDO.  A23 (¶¶ 83-85).  And he concedes that Something Ideal alone "created [the] applicant pool" and "hired from" it.  A31 (¶ 138).  The sole connection Harker alleges between BBDO and Meta, on the one hand, and Something Ideal's implementation of the DTL Program, on the other, is that BBDO "and/or" Meta "participated in the DTL initiative" by "commit[ing] to 'cover[] the cost'" of hiring the DTL gaffer through a "'clearly labeled' budget identifying the cost of the DTL initiative."  A25 (¶¶ 97-99).  Harker does not allege that AICP had any role in making the commercial except insofar as AICP allegedly created the DTL Program.  A14 (¶ 21).

### 3.    Harker's Extensive Experience In The Industry

Harker touts himself as an "experienced motion picture lighting technician who, for over twenty-seven years, has worked on major commercial, feature film, and television productions."  A12 (¶ 5); *see also* A17 (¶ 34).  "Most of his work" has been done as a "gaffer, best boy, or electrician."  A17 (¶ 35).  Harker does not allege that he lacks access or exposure to the commercial production industry, that he needs training as a gaffer, or that he lacks experience as a gaffer.  *See, e.g.*, A12,

17-18 (¶¶ 5, 34-37).  On the contrary, Harker highlights his experience "generally, and as a gaffer particularly, [which] includes understanding protocols, work practices, and electrical equipment."  A18 (¶ 36).  While Harker does allege that he would "like to increase his experience as a gaffer," he does not allege that he needs or wants apprenticeship training and makes no other effort to allege he was qualified for the DTL Program.  *Id.* (¶ 37).

### B.    Procedural Background

On September 5, 2023, Harker filed suit, bringing claims against the Non-Employer Defendants under 42 U.S.C. §§ 1981 and 1985(3), and the New York State Human Rights Law, N.Y. Exec. Law § 296.  A26-28, 32-34 (¶¶ 105-22, 148-54).[1]  On November 3, 2023, the Non-Employer Defendants and Something Ideal each filed motions to dismiss for lack of Article III standing and failure to state a claim.  A7 (Dkt. Nos. 24-27).  Rather than respond, Harker amended his complaint on November 22, 2023.  A8 (Dkt. No. 34); A11-35.  In his First Amended Complaint ("FAC"), Harker alleged for the first time that although AICP had designed and advertised the DTL Program as an apprenticeship program, Something Ideal did not implement it that way.  A24 (¶ 94).

---

[1]    Harker also brought Title VII discrimination and retaliation claims, as well as a Section 1981 retaliation claim against his employer, Something Ideal.  *See* A29-32 (¶¶ 122-47).  Because those claims do not lie against the Non-Employer Defendants, they are not discussed in this brief.

Following a second round of briefing on the parties' motions to dismiss, the District Court dismissed Harker's complaint for lack of Article III standing. A53-63. The Court held that Harker lacked standing for two reasons.

*First*, Harker did not "allege that he made any attempt to express his interest in working as a gaffer on the [commercial]." A57. "This failure is fatal to his claim," the District Court explained, "because standing to challenge a discriminatory policy 'requires an intent that is concrete' that 'must go beyond a "few words of general intent."'" *Id.* (citation omitted). The Court noted that although Harker "could not have applied to a DTL-Gaffer position before he learned about the program, [he] never applied or otherwise expressed his interest in being considered for a DTL-Gaffer role in the future, even *after* he learned about the program." A58. Moreover, Harker "proffer[ed] that he 'did not seek to be a *non*-DTL gaffer' or otherwise express a concrete interest in performing gaffer work," even though he claimed that "the DTL and non-DTL gaffer roles involved the same compensation and set of responsibilities." A57-58 (citation omitted). In the end, therefore, Harker pled "'an abstract, generalized grievance'" without any facts to support "'an actual desire to become' a DTL-Gaffer." A58 (citation omitted).

The District Court also rejected Harker's argument that this Court's decision in *Petrosino* endorsed his broad view of standing. The District Court concluded that this "narrow" exception for "failure-to-promote" claims did not apply for multiple

reasons, including because, even in *Petrosino*, this Court "required the plaintiff to, at a minimum 'tell[] her supervisors that she wished to be considered for' the job opportunities that she sought." A60-61 (alteration in original) (quoting *Petrosino*, 385 F.3d at 228). But Harker "d[id] not allege any facts suggesting that he communicated his desire to work as a gaffer, or that Something Ideal could have known that he was interested in working as a gaffer." A61. Because there was "no dispute" that Harker "knew that a gaffer position would be available on future commercial productions" based on his "over twenty-seven years of experience," the fact that he never applied or even expressed any interest in a gaffer position—either before the December 2022 commercial or after—suggests "'an abstract, generalized grievance.'" A58 (quoting *Carney*, 592 U.S. at 63).

*Second*, the Court held that Harker also failed to plead standing, because he had not alleged that he was "ready and able" to apply to the DTL gaffer position. A58-59 (citation omitted). Although Harker alleged that he "'would like to increase his experience as a gaffer,'" he gave no "indication as to why, as an industry veteran with twenty-seven years of experience, he would seek to participate in a program designed to allow candidates who 'ha[ve] not previously had access to [the commercial production] business, but [are] qualified in the role to have access to the production to learn the nuances around commercial production in a real, hands on way.'" A59 (alterations in original) (quoting A16, 18 (¶¶ 30, 37)). The Court

10

acknowledged Harker's newfound contention that Something Ideal did not actually implement the DTL Program as an apprenticeship program, but concluded that this allegation was "contradicted by other allegations in the [FAC], including that the DTL [Program] was advertised as an 'apprenticeship program' and that the individual hired for the DTL-Gaffer position that Mr. Harker allegedly desired 'lacked experience as a gaffer.'" *Id.* (quoting A19, 24-25 (¶¶ 47, 93, 95)).

Finally, the District Court denied Harker leave to amend, emphasizing that Harker had "already amended his complaint once after refusing to engage in pre-motion communications as required by [the District Court's] individual practice rules," had gone through "two rounds of dismissal motion practice" that each "included substantial briefing on the issue of standing," and had "proffered [no] additional facts that suggest that he can augment his already-amended pleading to establish that he has standing." A62.

Because the District Court dismissed for lack of Article III standing, the Court did not reach Defendants' alternative arguments that Harker failed to state a claim.

## SUMMARY OF ARGUMENT

The District Court correctly held that Harker lacks Article III standing for two independent reasons.

*First*, Harker cannot establish a concrete injury, because he fails to allege that he applied for—or even expressed interest in—any gaffer position. This Court's

case law generally requires plaintiffs suing for employment discrimination to apply for the position they claim they were unlawfully denied. *See, e.g.*, *Brokamp v. James*, 66 F.4th 374, 387 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024). Absent an application, an employer cannot be expected "to divine an employee's unexpressed hopes and desires." *Beebe v. New York Times Co.*, 666 F. Supp. 2d 321, 333 (E.D.N.Y. 2009) (citation omitted). Rather, the employee must actually make that desire known. But, here, Harker concedes that he did not do so. Not only did he fail to apply for a DTL gaffer position, he did not apply for *any* relevant gaffer position, or make Defendants aware of his interest in such a position at any time— even *after* he was offered a best boy position on the December 2022 commercial. Instead, Harker claims standing based solely on an unspoken desire for the position, expressed for the first time in this litigation. This Court's precedent squarely forecloses such an unbounded conception of standing.

*Second*, Harker lacks standing because he does not allege that he was qualified for the DTL Program. As described in his original complaint, the DTL Program was advertised as an "apprenticeship" program, designed for individuals who lack experience in, and exposure to, the commercial production industry. Dkt. No. 1 (¶ 57). Harker concedes that, as a veteran of the commercial production industry with twenty-seven years of experience (including as a gaffer), he does not meet that criteria. And it is well-settled that an applicant who does not meet the qualification

requirement for a position lacks standing to challenge alleged discrimination in hiring. After all, courts assume that "an unqualified plaintiff was not hired or promoted for the obvious reason—that he was unqualified." *Melendez*, 79 F.3d at 668.

In his FAC, Harker asserted for the first time that Something Ideal misapplied the program criteria by offering DTL roles to people who were experienced in the commercial production industry in the relevant positions. A24-25 (¶¶ 94-95). The complaint offers no objective details to support that newfound assertion. But, regardless, those allegations at most demonstrate that individuals who were *also* unqualified for the program were incorrectly offered positions; it does not establish that Harker—with his decades of experience—*was* qualified for an apprenticeship program.

In any event, allegations about Something Ideal's misadministration of the program cannot establish standing to sue the *Non-Employer Defendants*. To prove Article III standing, a plaintiff must show that the defendant *caused* his injury. Here, Harker does not allege that Meta, BBDO, or AICP knew Something Ideal was allegedly misapplying the program. As Harker concedes, the Non-Employer Defendants played no role in his or anyone else's hiring. A18, 23, 31 (¶¶ 40-42, 83-85, 137-38). Accordingly, Harker has not alleged an injury attributable to the Non-Employer Defendants.

Finally, to the extent that Harker is attempting to establish standing to seek forward-looking injunctive relief in addition to backward-looking damages, he has not done so. Harker does not allege he ever took any concrete steps toward applying for a gaffer position or would otherwise be qualified for the DTL Program. Thus, he cannot establish standing for prospective relief.

For all those reasons, the District Court's dismissal order should be affirmed.

## STANDARD OF REVIEW

The Second Circuit "review[s] de novo . . . dismissals for lack of standing pursuant to Rule 12(b)(1) when, as here, the district court based its decision solely on the allegations of the complaint and the undisputed facts evidenced in the record." *Trs. of the Upstate New York Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566-67 (2d Cir. 2016). The court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* at 566. However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison*, 547 F.3d at 170 (citation omitted).

## ARGUMENT

The District Court correctly dismissed Harker's complaint for lack of Article III standing. To plead standing, a plaintiff must allege "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was

14

likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Harker fails to do so for two reasons. First, Harker fails to plead that he applied for—or even registered interest in—a gaffer position on the commercial. Instead, he rests solely on his proffer during litigation that he *would* have been interested in the DTL gaffer position had he been aware of it. It is well-settled that a plaintiff with only a "generalized grievance" against an employer lacks standing to challenge a hiring decision. *Carney v. Adams*, 592 U.S. 53, 63 (2020); *see Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.* (*FASORP*), 11 F.4th 68, 76-78 (2d Cir. 2021). Second, Harker fails to allege he was qualified for the DTL gaffer position—and indeed, his allegations establish the opposite. As promoted by AICP and funded by Meta/BBDO, the DTL Program is designed to help inexperienced individuals gain "access" and exposure to the commercial production industry through "apprenticeship[s]." A16, 24 (¶¶ 30, 93). But Harker alleges he has over twenty-seven years of experience, including as a gaffer, making him ill-suited for the program regardless of his race. Harker's suit was rightly dismissed for both of these independent reasons, and this Court should affirm.

# I.    HARKER FAILS TO ALLEGE HE APPLIED FOR A GAFFER POSITION

## A.    Harker Does Not Allege He Ever Expressed Any Interest In A Gaffer Position To Any Defendant, Much Less Applied For One

As a general rule, a plaintiff challenging an allegedly discriminatory policy must allege that he actually "submit[ted] to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997).  In an employment discrimination case, that typically means that the plaintiff must have "appli[ed]" for the relevant position. *Brokamp v. James*, 66 F.4th 374, 387 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024); *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-68 (1972) (no standing to challenge membership policy where plaintiff had not "sought membership in Moose Lodge and been denied it"); *Abadi v. City of New York*, No. 22-1560-cv, 2023 WL 3295949, at *2 (2d Cir. May 8, 2023) (no standing to challenge municipal-job vaccination requirement because plaintiff did not allege he applied for employment with the city), *cert. denied*, 144 S. Ct. 260 (2023); *Mitchell v. Planned Parenthood of Greater New York, Inc.*, No. 23-cv-01932, 2024 WL 3849192, at *11 (S.D.N.Y. Aug. 16, 2024) (collecting discrimination cases requiring applications).

The purpose of this "application requirement" is to ensure that the plaintiff has suffered a "legally cognizable injury."  *Brokamp*, 66 F.4th at 387.  When a plaintiff "complains that he is being denied a benefit that is not itself constitutionally

guaranteed—e.g., a club membership, admission to a private school, a job, a parking permit—for unconstitutional (or other unlawful) reasons . . . there is no legally cognizable injury until there is a denial." *Id.* Requiring plaintiffs to allege that they applied to the specific job they claim was unlawfully denied to them "ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc." *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004). In that way, the specific-application requirement protects both the Court's jurisdiction and the fact-finder's resources.

The specific-application requirement "also protects employers" by shielding them from "the unfair burden of having 'to keep track of all employees who have generally expressed an interest in [a job or] promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply.'" *Id.* (second alteration in original) (citation omitted). As this Court has recognized, it simply is not possible for an employer to consider every qualified person for an open position absent any indication that the specific person is interested in, and would accept, the job. For all those reasons, a plaintiff seeking to establish Article III standing to challenge an allegedly discriminatory hiring process cannot simply

allege that he "'*intend[ed]*'" to apply for [a particular] job[]." *FASORP*, 11 F.4th at 76-77.

That straightforward principle resolves this case. Harker admits that he did not apply for, or even register any interest in, the DTL gaffer position. *See* A18 (¶ 41). Indeed, Harker "fails to allege that he made *any* attempt to express his interest in working as a gaffer" at *any* time to *any* Defendant. A57-58 (emphasis added). As the District Court correctly held, that is "fatal to his standing." A57.

First, Harker does not allege that he ever sought a DTL gaffer position. As the District Court noted, "although Mr. Harker could not have applied to a DTL-Gaffer position before he learned about the program, Mr. Harker never applied or otherwise expressed his interest in being considered for a DTL-Gaffer role in the future, even *after* he learned about the program on December 14, 2022." A58. Second, Harker does not even allege that he ever sought what he deems to be an equivalent position, that of *non*-DTL gaffer. *See* A14-19, 24-25 (¶¶ 22, 28, 32, 41, 49, 93-95). That is "noteworthy because Mr. Harker . . . alleges that the DTL and non-DTL gaffer roles involved the same compensation and set of responsibilities." A58. Because Harker failed to apply for what he deems an identical position (the non-DTL gaffer), it is not plausible to infer that he would actually have been interested in, and applied for, the DTL gaffer position.

18

The Supreme Court's decision in *Carney* is instructive. There, the Supreme Court considered whether the plaintiff, a lawyer and registered independent, had standing to challenge Delaware's party-membership requirements for its state judiciary. *Carney*, 592 U.S. at 55. The plaintiff argued that he had standing because he was able and ready to apply for a judgeship if the state's party-membership requirements were lifted. But the Court concluded that the plaintiff lacked standing because, among other things, he had failed to apply for numerous open judgeships when he was a registered Democrat. *Id.* at 60-61. The plaintiff's failure to apply in the past when he would have satisfied Delaware's party-membership requirements suggested that the plaintiff lacked a genuine interest in applying now. A similar inference applies here: Harker's failure to seek the non-DTL gaffer position—a position indisputably open to all qualified individuals—indicates that he was not injured by his failure to receive a DTL gaffer position on the commercial.

Ultimately, Harker's argument is that he can establish standing simply by pointing to a post-hoc desire for a position he never sought and whose equivalent role he never expressed any interest in. But, as numerous courts in this Circuit have recognized, "a plaintiff who does not make a specific effort to apply for a particular position cannot claim discrimination since 'an employer cannot fairly be penalized for failing to divine an employee's unexpressed hopes and desires.'" *Beebe v. New York Times Co.*, 666 F. Supp. 2d 321, 333 (E.D.N.Y. 2009) (citation omitted); *see*

19

*also Wong v. Kings Cnty. Dist. Att'y's Off.*, No. 02 CV 3740, 2004 WL 692165, at *4 (E.D.N.Y. Mar. 31, 2004) ("It does not ask too much of an employee to require that he or she express, in words or substance, 'I want the job,' as a condition for bringing a discrimination action . . . .").

Harker thus does not come close to satisfying his burden of "alleg[ing] facts that affirmatively and plausibly suggest that [he] has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Instead, his allegations reflect nothing more than a generalized grievance, unmoored from any "concrete" and "particularized" injury. *Carney*, 592 U.S. at 60.

## B. Harker's Attempts To Invoke Narrow Exceptions To The Application Requirement Fail

Harker principally argues that he did not need to apply for a DTL gaffer position because he did not know about the DTL program prior to the December 2022 commercial. But that admission is itself fatal. If Harker was unaware of the position—and so did not apply for it—he would *not* have received that position, regardless of any alleged discrimination.

In any event, here there were numerous other ways in which Harker could have at least "express[ed] his interest" in the position—including by applying for a *non*-DTL gaffer position or noting a prospective interest in DTL-gaffer positions, after he became aware of the DTL program. A57-58. But Harker did not even do that. Instead, Harker relies solely on his proffer made for the first time in litigation

20

that he *would* have applied for the position before the December 2022 commercial had he known about it. That is not enough. *See* A57 ("[S]tanding to challenge a discriminatory policy 'requires an intent that is concrete' that 'must go beyond a "few words of general intent."'" (citation omitted)).

Unable to plead the necessary facts, Harker instead tries to read two cases—*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), and *Petrosino*—as creating capacious exceptions to the ordinary principles of standing, which would permit parties to bring litigation without a single concrete act registering their interest in the relevant position. Neither case remotely supports a rule of such breathtaking scope.

In *Teamsters*, the Supreme Court held that a plaintiff need not apply if he knew based on the defendant's actions that doing so would be a "futile gesture." *Int'l Bhd. of Teamsters*, 431 U.S. at 365-66. For instance, if an employer posts "a sign reading 'Whites Only' on the hiring-office door," a Black prospective employee need not subject himself to a fruitless application process just to establish what he has already been told: that he won't get the job. *Id.* This exception to the specific-application requirement is designed for circumstances where "known," "pervasive," and "entrenched" discrimination "deter[s] job applications" from members of the disfavored community, who are "aware of the futility" of seeking jobs they know are limited to individuals of a different race. *Id.* at 367-69. In short, where an

21

application would "serv[e] only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him," a specific application is not required for Article III standing. *Id.* at 367.

Although Harker references *Teamsters* in passing, that framework has no relevance here, because it applies only where a plaintiff is *aware* of the position and can "prov[e] that [they] would have applied for the job had it not been for [the defendants' challenged] practices." *Id.* at 367-68; *see id.* at 367 (exception applies where submitting a formal application would "serv[e] only to confirm a discriminatee's *knowledge* that the job he wanted was unavailable to him") (emphasis added); *United States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir. 1989) ("[W]hen an employer's discriminatory policy is *known*, subjecting oneself to the humiliation of explicit and certain rejection is not required to make out a case of discrimination." (emphasis added)). By contrast, *Teamsters* does not apply where the plaintiff fails to allege he was "aware" of the challenged "policy so as to reasonably believe that a formal application" would have been "futile." *Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408, 1415-16 (3d Cir. 1990) (finding no standing because NAACP failed to allege its members were aware of the challenged policy such that they could have concluded applying would be futile).

Because, as Harker admits, he was *not* aware of the DTL Program prior to the December 2022 commercial, he cannot have been "deterred from applying" for it at

that time. *See id.* at 1414; A57-58. Harker cites no contrary case applying the *Teamsters* exception where the plaintiff was unaware of the challenged policy at the time of application. Because Harker had no knowledge of the DTL Program, he cannot invoke the *Teamsters* exception with respect to the December 2022 commercial.[2]

Harker's attempt to invoke this Court's decision in *Petrosino* fares no better. In *Petrosino*, this Court recognized that there may be a "narrow" subset of cases in which the "'particular'" facts of the case make the specific-application requirement "'quixotic.'" 385 F.3d at 227 (citation omitted). As the Court explained, a central purpose of the specific-application requirement is to put the employer on notice of the employee's interest in a position. *Id.* While an application is generally required to provide that notice, there may be special circumstances where an employer can either be deemed to have been aware of the employee's interest in a position or can be held liable for keeping the vacancy of a position secret in a discriminatory way. In particular, the Court held that, in the context of a "failure to promote" claim, a

---

[2] Even if Harker could invoke the *Teamsters* exception for a job he knew nothing about and thus was not deterred from applying for, Harker does not and cannot allege that applying for a *non-DTL* gaffer position would have been futile. *See* A57-58. And as explained, according to Harker, there is no meaningful difference between the DTL and non-DTL gaffer positions. *See* A14-19, 24-25 (¶¶ 22, 28, 32, 41, 49, 93-95); A58. Thus, any attempt by Harker to invoke the *Teamsters* exception would fail for this independent reason too.

23

plaintiff need not allege that he applied for a specific promotion when (1) "the vacancy at issue was not posted" and (2) "the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* at 226-27. That exception does not apply here for at least two reasons. First, it is limited to failure-to-promote cases; and second, Harker does not satisfy the "no knowledge" or "informal" application "attempt[]" prong.

*First*, *Petrosino*'s exception is limited to failure-to-promote cases, and has never been applied to the failure-to-hire context. *See Rich v. Associated Brands Inc.*, 559 F. App'x 67, 68 (2d Cir. 2014) (*Petrosino* "may not apply in the context of failure to hire"). This Court should not accept Harker's invitation to expand that "narrow" exception. *Id.* at 68.

As explained above, the "specific application" requirement is designed in part to "protect[] employers from the unfair burden of having 'to keep track'" of every person who has "'expressed an interest'" in a position, so any exceptions to it should be strictly construed. *Petrosino*, 385 F.3d at 227 (quoting *Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998)). And while employers may have an obligation to ensure their *own* employees are aware of promotion opportunities, it would impose an impossible burden to require the same with respect to non-employees who are applying to work with the employer in the first instance. Expanding *Petrosino* in

24

this manner would be to establish a legally-mandated public-posting requirement for each and every job opportunity. Small mom-and-pop shops who offered a stockroom job to a neighborhood teenager would suddenly be at risk of liability for not offering the job to another teenager of a different race, even if they had no reason to know that other teenager was interested in the job.

That rule would be especially burdensome on industries like the commercial production industry, where individuals are routinely hired on short-term, one- or two-day contracts. If *Petrosino*'s exception were expanded to the failure-to-hire context, then any person who was unaware of an available position to work on a one-day commercial shoot could conceivably sue for discrimination, even if that person had never expressed any interest in working with the particular production company, much less on the particular commercial. That would expand *Petrosino* far beyond its bounds, and result in courts routinely adjudicating cases with no concrete injury. *Cf. Brown*, 163 F.3d at 711 ("[I]t would be unthinkable to routinely permit non-applicant plaintiffs in individual suits to recover back pay, retroactive seniority, and the like based on what amounts to mere speculation that they would have been rejected for discriminatory reasons had they applied." (citation omitted)). Because *Petrosino* does not and should not apply to the failure-to-hire context, Harker may not rely on it to establish standing here.

*Second*, even assuming *Petrosino* applies to the failure-to-hire context, Harker does not satisfy its second prong—namely, that the plaintiff "either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." 385 F.3d at 227. Harker claims that he was unaware of the DTL Program prior to the December 2022 Meta commercial. A20 (¶¶ 52-53). But even taking that assertion as true, Harker was indisputably aware of the need to hire a gaffer more generally. Indeed, Harker's allegations establish that he is a repeat player in the industry with almost three decades of experience, A12, 17 (¶¶ 5, 34-35), and he admits that he has frequently worked with the defendant production company, Something Ideal, *see* Dkt. No. 46 at 13. The only plausible inference to draw is that Harker was aware of Something Ideal's staffing needs and procedures and thus understood that a gaffer would need to be hired on each future production. *See* A58 ("There is also no dispute that Mr. Harker, who has over twenty-seven years of experience working in the commercial production industry, knew that a gaffer position would be available on future commercial productions.").

Yet, as discussed above, Harker never sought to apply for *any* gaffer position. Thus, as in *Petrosino* itself, while "posting failures may have excused [Harker] from filing a timely formal application . . . that [does] not excuse [him] from informally applying for the positions by telling [his] supervisors that [he] wished to be

26

considered for [the] openings when [defendant] decided to fill them." 385 F.3d at 228. As a district court in this Circuit recently explained, the *Petrosino* exception does not apply where the plaintiff "was aware . . . there would be a vacancy for the [desired] position that would have to be filled." *Jean-Gilles v. Rockland County*, No. 20-cv-1999, 2024 WL 1348791, at *10 (S.D.N.Y. Mar. 29, 2024). As in *Jean-Gilles*, Harker was indisputably aware that a gaffer would need to be hired for each commercial, yet he never contacted Something Ideal "by phone, email, or in person regarding [his] interest" in that position. *Id.* And while Harker contends that Something Ideal should have affirmatively offered him a gaffer position, "the burden [i]s not on [the employer] to assume that [the] [p]laintiff would be interested" in a particular job "and seek him out to inquire further about his interest." *Id.*; *see also Ighani v. City of Hartford*, No. 09-cv-2111, 2012 WL 3728025, at *3 (D. Conn. Jan. 4, 2012) (*Petrosino* does not apply where plaintiff "concede[d] that he knew the City was planning to hire" for the position he wanted in the next six months, despite plaintiff's allegation that he did not see a specific posting for the job).

In the District Court, Harker argued that he could not have applied or even expressed an interest in working as a gaffer on *this* commercial because when he was offered the best boy job, he was informed that Something Ideal had already hired the gaffer. *See* A58 n.3. As an initial matter, that allegation is not in Harker's complaint. Harker made that assertion for the first time in his opposition to

27

Something Ideal's motion to dismiss, attaching an email offering him the job. *See* A-9 (Dkt. No. 45-1). But facts may not be added for the first time in opposition briefs. *See, e.g.*, *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."). Thus, this allegation is not before this Court.

Regardless, even if it were properly before the Court, Harker still could have at least expressed his *general* interest in being considered for gaffer positions before the December 2022 commercial. *See, e.g.*, *Petrosino*, 385 F.3d at 228 (plaintiff could and should have "informally appl[ied] for the positions by telling her supervisors that she wished to be considered for [them]"); *Jean-Gilles*, 2024 WL 1348791, at *10 (plaintiff could have informed employer of his "interest" in the position "by phone, email, or in person"). Or, at an absolute minimum, he could have responded to the offer of a best boy position, by expressing that he would be interested in future gaffer positions. Yet Harker does not allege even that. *Petrosino* does not license unbounded standing for any individual who *later* proffers they had an unspoken interest in a position. As the District Court explained, "Harker's argument that the gaffer role had already been filled by the time he was offered the role as the best boy electrician on the Production does not alter the fact that Mr.

28

Harker has not alleged that he *ever* expressed interest in gaffer work to any defendant." A58 n.3 (emphasis added).

Finally, for the first time on appeal, Harker suggests that he satisfied the *Petrosino* exception because "Something Ideal already knew that Harker was interested in and willing to fill motion picture electrical technician positions." Appellant's Br. 11; *see also id.* at 23. But again, Harker never alleged as much in his complaint, and regardless, expressing an interest in "electrical technician positions" is not the same thing as expressing an interest in a gaffer position *specifically*. A restaurant dishwasher who expresses interest in being reassigned to a front-of-house position could mean anything from busser to server to host. Absent some further specification from Harker, he cannot complain when Something Ideal offered him exactly what he says he requested: an "electrical technician position."

Again, *Petrosino* itself is instructive. There, this Court held that the plaintiff had not satisfied the exception's second prong with respect to her claim that she was denied a promotion to an "official manager" position because the plaintiff never "t[old] her supervisors that she wished to be considered for" a "specific" "official manager opening[]." *Petrosino*, 385 F.3d at 227-28. While the plaintiff had expressed interest in "temporary" or "acting" manager positions, the Court held that this was not the same as expressing an interest in an "official" manager position. *Id.* at 227-29. Without any effort to apply even informally for the specific position she

claimed that she wanted, the plaintiff could not assert a claim that she was denied that position on the basis of her protected characteristics.

Indeed, Harker has alleged even less than what this Court found insufficient in *Petrosino*. In *Petrosino*, the Court held that "generally request[ing] promotion consideration" or expressing interest in a similar temporary position was insufficient. *Id.* at 227-29; *see also Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807-08 (1st Cir. 2006) ("[A] general expression of interest in, without formal application for, a position is insufficient to support a legal claim of adverse employment action."). Here, Harker never even expressed a general interest in any gaffer position to any Defendant—whether under the DTL Program or not. Instead, he just alleged a post-hoc interest in the position during litigation. That is plainly not enough. *See, e.g.*, *Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *12 (S.D.N.Y. Sept. 30, 2016) (*Petrosino* does not apply where plaintiff "d[id] not allege that he ever even spoke with anyone about the position, let alone that he sought to apply").[3]

---

[3] Harker complains that the District Court improperly treated *Petrosino* as a merits-only rule, rather than applying it at the standing stage. Appellant's Br. 18-19. This Court has never applied *Petrosino* to confer standing on a plaintiff that otherwise would not meet Article III's requirements. But, as the District Court also correctly recognized, Harker fails to satisfy *Petrosino*'s requirements regardless. Accordingly, this Court need not address whether *Petrosino* is limited to the merits stage.

Ultimately, *Petrosino* just re-affirms the basic principle that a person suing for employment discrimination cannot base their complaint on unspoken hopes and dreams alone. Even under *Petrosino*, a plaintiff must plead some affirmative facts suggesting that their employer knew of their interest in a position and denied them the position on the basis of a protected characteristic. Harker pleads no such facts. If he nevertheless is found to have standing, the consequences would be extraordinary: any person—regardless of their connection to an employer—could bring suit to challenge any employment practice they viewed as discriminatory, even if they never once sought the job at issue. This Court's precedent does not remotely support that result.

## II.   HARKER FAILS TO ALLEGE HE WAS QUALIFIED FOR THE DTL POSITION

Harker also cannot establish Article III standing because he fails to allege that "he [meets] the minimum qualifications for the [DTL] position." *Houser v. Pritzker*, 28 F. Supp. 3d 222, 236-37 (S.D.N.Y. 2014) (collecting cases); *see also Carney*, 592 U.S. at 59-66 (plaintiff must allege that he is "able and ready" to apply, meaning he "meets the minimum qualifications" (citations omitted)). After all, courts assume that "an unqualified plaintiff was not hired or promoted for the obvious reason—that he was unqualified." *Houser*, 28 F. Supp. 3d at 237 (quoting *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996)).

The DTL program is an "apprenticeship training" program designed to allow candidates who have not "previously had access to [the commercial production] business" to gain much "needed experience." A16, 24 (¶¶ 30, 93). But Harker has had almost *three decades* of "access" to, and "experience" in, the commercial production industry—including as a gaffer. *See, e.g.*, A17 (¶¶ 34-35) ("Most of his work over the last twenty-seven years was done as a gaffer, best boy, or electrician."). It is precisely this extensive experience that makes Harker unqualified for the DTL Program. While Harker alleges that he "would like to increase his experience as a gaffer," A18 (¶ 37), a bare desire to do so does not qualify Harker for a program that is designed for those who lack "access" to the commercial production industry, *see* A16, 24 (¶¶ 30, 93). Harker does not, and cannot allege, that he "need[s]" any "apprenticeship training," regardless of his subjective desire for *more* experience as a gaffer. A24 (¶ 93).

Harker has never disputed any of this, conceding that he does not meet the program's announced requirements. Rather, he amended his original complaint to allege that he was qualified for the DTL Program because Something Ideal did not *implement* it as a true apprenticeship program. A24 ( ¶¶ 93-94). But as the District Court explained, "Harker's allegation that the DTL program was not a genuine apprenticeship program is contradicted by other allegations in the [FAC], including that the DTL was advertised as an 'apprenticeship program' and that the individual

hired for the DTL-Gaffer position that Mr. Harker allegedly desired 'lacked experience as a gaffer.'" A59; *see* A19-20 (¶¶ 47-48, 50, 56-58). Harker does not allege that Something Ideal hired anyone with his decades of experience in the industry as a DTL gaffer. On the contrary, Harker alleged that the person hired as DTL gaffer "lacked experience as a gaffer" and had "limited knowledge of the electrical equipment and work practices on set." A19-20 (¶¶ 47-50, 58). In other words, that person *did* meet the criteria for the DTL program in exactly the way that Harker *did not*. Because Harker does not allege that the DTL Program operated as anything other than a bona fide apprenticeship program for the relevant gaffer position he claims he was denied, he cannot show he was qualified for that position.

Nor do Harker's allegations that three of the nine *other* DTL hires for the commercial were "experienced" suffice to establish standing. A20-22 (¶¶ 59-73). Harker alleges that a DTL prop master, key grip, and electrician did not act as "apprentice[s]" to their non-DTL counterparts and were "experienced" in their roles. *Id.* But those allegations are plainly insufficient to establish Harker's broad assertion that DTL Program was a "sham apprenticeship program." Appellant's Br. 1. Harker's subjective impressions of others' qualifications for roles "for which he does not claim relevant skills, and in which he never expressed interest in performing" should be entitled to no weight. A59. He offers no allegations of objective facts regarding these employees' experience. He does not allege, for instance, how many

years of experience these crew members had, and he certainly does not allege that any of them had the same decades of industry experience he does.

But even if Harker's vague and subjective impressions regarding these three individuals were enough, that still does nothing to fix the central problem: Harker is not qualified for the DTL Program. At most, Harker would have established that Something Ideal misapplied the program criteria by hiring certain individuals who were *also* not qualified. But it would still be the case that Harker—with his decades of experience as a gaffer—had no entitlement to be considered for an apprenticeship program. Or, put another way, Harker cannot be injured because Something Ideal *correctly* administered the program in his case, even if it did so incorrectly as to three other applicants.

Finally, and in any event, Harker's allegations regarding Something Ideal's alleged misadministration of the program cannot give rise to standing against *the Non-Employer Defendants*. To establish standing, Harker must allege that the Non-Employer Defendants caused his injury. *See TransUnion LLC*, 594 U.S. at 423. But Harker does not allege that the Non-Employer Defendants had any role in his staffing or that they knew Something Ideal staffed candidates in a manner that allegedly deviated from the apprenticeship program that AICP allegedly created and BBDO and Meta allegedly agreed to fund. A18 (¶¶ 40-42); *see also* A43 (¶¶ 5-6). Harker therefore has not alleged any facts tying AICP's alleged creation of an

34

apprenticeship program and Meta's and BBDO's alleged funding of that program to any injury he suffered.  In other words, Harker does not (and cannot) allege that he was qualified for the DTL Program *that the Non-Employer Defendants allegedly funded and endorsed*.  Accordingly, Plaintiff cannot meet the causation prong of the standing inquiry with respect to the Non-Employer Defendants.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party . . . .'" (final alteration added) (citation omitted)); *HealthNow New York Inc. v. New York*, 448 F. App'x 79, 81 (2d Cir. 2011) (no standing where plaintiff "cannot demonstrate that [its] injury is *caused* by any action on the part of the [defendant]," as opposed to some other party).

## III. HARKER HAS NO STANDING TO SEEK PROSPECTIVE INJUNCTIVE RELIEF

Finally, although Harker primarily focuses on proving past injuries associated with the December 2022 commercial, he occasionally references ongoing or future injury.  To the extent that Harker seeks to establish Article III standing to seek prospective relief, his allegations still fail because he does not allege that he has any "concrete plans" to apply for a gaffer position, that he has taken any concrete steps to do so, or that he would be qualified for a DTL position in any event.  *See FASORP*, 11 F.4th at 77 ("[Plaintiff's] allegations exhibit the kind of 'some day intentions'

that cannot 'support a finding of [] actual or imminent injury'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) (alteration in original)).

* * *

For all those reasons, the District Court correctly dismissed Harker's complaint for lack of Article III standing. As the District Court explained, Harker has no concrete interest in this case because he never applied for any gaffer role, whether before, on, or after the December 2022 commercial. And Harker would not have qualified for a DTL gaffer role anyway due to his decades of industry experience. Allowing Harker to sue nonetheless would be to endorse a limitless theory of standing where essentially anyone who proffers during litigation that they had an unspoken interest in a position could sue a prospective employer for their failure to obtain that position. This Court should not embrace that theory.[4]

---

[4] The District Court correctly denied Harker leave to amend his complaint because he had already had an opportunity to amend once and had failed to engage in required pre-motion communications despite Defendants' attempts to engage with him. A62. On appeal, Harker does not challenge the denial of leave to amend, so he has waived any argument on that front. *See, e.g.*, *Errato v. Seder*, No. 23-638, 2024 WL 726880, at *3 (2d Cir. Feb. 22, 2024) ("Errato has forfeited any argument that the district court erred in dismissing his complaint without leave to amend by not raising the issue in his opening brief.").

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's dismissal of Harker's complaint for lack of Article III standing.

Dated:  February 4, 2025

Respectfully submitted,

 /s/ Guy Cohen
Guy Cohen
DAVIS+GILBERT LLP
1675 Broadway
New York, NY 10019
(212) 468-4853

*Counsel for Defendant-Appellee*
*BBDO Worldwide, Inc.*

 /s/ Paul P. Rooney
Paul P. Rooney
ELLENOFF GROSSMAN & SCHOLE LLP
1345 Avenue of the Americas
11th Floor
New York, NY 10105
(212) 370-1300

*Counsel for Defendant-Appellee*
*Association of Independent*
*Commercial Producers, Inc.*

 /s/ Samir Deger-Sen
Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com

Danielle Conley
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004

Melanie M. Blunschi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

*Counsel for Defendant-Appellee*
*Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4) because it contains 8,829 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  February 4, 2025                                      */s/ Samir Deger-Sen*
                                                                           Samir Deger-Sen