# 24-2555

## United States Court of Appeals

### *for the*

## Second Circuit

JAMES HARKER,

*Plaintiff-Appellant*,

– v. –

META PLATFORMS, INC., ASSOCIATION OF INDEPENDENT COMMERCIAL PRODUCERS, INC., SOMETHING IDEAL, LLC, DBA M SS NG P ECES, BBDO WORLDWIDE, INC.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (No. 1:23-cv-07865-LTS)

**REPLY BRIEF FOR PLAINTIFF-APPELLANT**

Ronald A. Berutti
**MURRAY-NOLAN BERUTTI LLC**
30 Wall Street
8th Floor
New York, NY 10005
(212) 575-8500
ron@mnblawfirm.com

Clark Lassiter Hildabrand
**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
Fax: (202) 220-9601
childabrand@cooperkirk.com

*Attorneys for Plaintiff-Appellant James Harker*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ...............................................................................1

STANDARD OF REVIEW ...................................................................3

ARGUMENT ......................................................................................4

I.    Harker Has Standing To Bring His Discrimination Claims. ..........................4

    A.    Harker plausibly alleged injury in fact.................................5

    B.    Harker plausibly alleged his injuries are fairly traceable to Defendants' challenged conduct. .........................................6

        1.    Harker plausibly alleged traceability. ........................................6

        2.    Harker satisfies both *Petrosino* options. ....................................11

        3.    Defendants' remaining traceability arguments are meritless....16

    C.    Harker plausibly alleged his injuries are redressable through judicial relief................................................................21

II.    Harker Has Standing To Bring His Retaliation Claims. ...............................22

III.    The Court Should Not Rule on Something Ideal's Rule 12(b)(6) Issues......23

CONCLUSION ...................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abadi v. City of New York*,
   No. 22-1560, 2023 WL 3295949 (2d Cir. May 8, 2023) .............................12

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) .......................................................................21

*Amadei v. Nielsen*,
   348 F. Supp. 3d 145 (E.D.N.Y. 2018) ........................................................3, 4

*Bohnak v. Marsh & McLennan Cos.*,
   79 F.4th 276 (2d Cir. 2023) ..........................................................................5, 6

*Brokamp v. James*,
   66 F.4th 374 (2d Cir. 2023) ...........................................................................12

*Brown v. Coach Stores, Inc.*,
   163 F.3d 706, 710 (2d Cir. 1998) ................................................................9, 10

*Carney v. Adams*,
   592 U.S. 53 (2020).........................................................................................12

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016) ...........................................................3, 4, 5, 19, 20

*Cottrell v. Alcon Labs.*,
   874 F.3d 154 (3d Cir. 2017) .............................................................................6

*DiCocco v. Garland*,
   52 F.4th 588 (4th Cir. 2022) .............................................................................5

*Do No Harm v. Pfizer Inc.*,
   126 F.4th 109 (2d Cir. 2025) ..........................................................................16

*EEOC v. Metal Serv. Co.*,
   892 F.2d 341 (3d Cir. 1990) ...........................................................................10

*FEC v. Cruz*,
   596 U.S. 289 (2022).......................................................................................14

*Grant v. Bethlehem Steel Corp.*,
   635 F.2d 1007 (2d Cir. 1980) ....................................................................2, 11

*Guthrie v. Rainbow Fencing, Inc.*,
   113 F.4th 300 (2d Cir. 2024) ...........................................................................6

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)...............................................................17, 18

*Jackson-Bey v. Hanslmaier*,
    115 F.3d 1091 (2d Cir. 1997) ...........................................7, 8, 9

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)....................................................................17

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972)....................................................................12

*Ne. Fla. Ch. of Assoc. Gen. Contractors v. City of Jacksonville*,
    508 U.S. 656 (1993)..............................................................15, 16

*New York ex. rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*,
    119 F.4th 270 (2d Cir. 2024) .....................................................24

*Patane v. Clark*,
    508 F.3d 106 (2d Cir. 2007) ......................................................14

*Petrosino v. Bell Atlantic*,
    385 F.3d 210 (2d Cir. 2004) .......................................2, 9, 11, 12

*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
    954 F.3d 529 (2d Cir. 2020) ....................................................3, 4

*Soule v. Conn. Ass'n of Schs., Inc.*,
    90 F.4th 34 (2d Cir. 2023) ....................................3, 4, 21, 22, 24

**Statutes**

42 U.S.C. § 2000e(b) ......................................................10, 11

# INTRODUCTION

Defendants-Appellees complain that Plaintiff-Appellant James Harker's "allegations reflect nothing more than a generalized grievance," Non-Employer Br. 20, and that allowing him "to sue nonetheless would be to endorse a limitless theory of standing where essentially anyone" could sue prospective employers, Non-Employer Br. 36. In Defendants' telling, Harker based his "complaint on unspoken hopes and dreams alone." Non-Employer Br. 31. That is not so.

Harker is an experienced electrician on commercial, film, and television productions who was regularly hired by Defendant-Appellee Something Ideal, LLC, before he pointed out that the Double the Line ("DTL") initiative was racially discriminatory. The Double the Line initiative intentionally discriminates against white men and women by making positions exclusively available to "BIPOC" individuals ("Black Indigenous People of Color"). Because of that racially discriminatory requirement, Harker was automatically excluded from a DTL gaffer position on a December 2022 production for Defendant-Appellee Meta Platforms, Inc. ("Meta"), that paid more than Harker was compensated as a best boy electrician. Since then, Harker has been excluded because of his race from all DTL positions on subsequent productions. And Something Ideal has retaliated against Harker by refusing to offer him work altogether, in either DTL or non-DTL roles. Harker is not complaining of an "abstract, generalized grievance." Employer Br. 12.

1

Nevertheless, Defendants attempt to insulate the Double the Line initiative from legal challenge because Harker did not apply for DTL positions. However, as Defendants do not contest, there is no application process whatsoever for the DTL positions. These vacancies are not posted, and Harker has no knowledge of the vacancies before they are filled, even though he would like to serve in DTL positions. *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004). Harker has suffered injuries in fact that are traceable to Defendants' racially discriminatory Double the Line initiative and Something Ideal's retaliatory hiring decisions. Those injuries are redressable by judicial relief. Harker, therefore, has standing.

Article III does not bar claims premised on a racially discriminatory policy of offering unposted positions only to members of certain races. *See Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1017 (2d Cir. 1980). As Defendants themselves concede, they "can be held liable for keeping the vacancy of a position secret in a discriminatory way." Non-Employer Br. 23; *see also* Employer Br. 40 (attempting to distinguish this case from those "where an employer created a new position in secret, only for the plaintiff to learn of the position at a later time"). That is what Defendants have done in creating and maintaining a racially discriminatory initiative that offers DTL positions on productions only to BIPOC individuals and does not provide white individuals notice of the positions' existence until Defendants have filled the positions with BIPOC individuals.

2

Because Harker has standing, the district court's order and judgment granting Defendants' motions to dismiss under Rule 12(b)(1) should be reversed. Although Something Ideal urges this Court to reach Something Ideal's Rule 12(b)(6) failure-to-state-a-claim arguments, those issues are not properly before this Court. In keeping with this Court's normal practice, the Court should allow the district court to assess Defendants' Rule 12(b)(6) motions "in the first instance" on remand. *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 42 (2d Cir. 2023) (en banc).

## STANDARD OF REVIEW

All parties agree that this Court reviews de novo the district court's dismissal of the complaint for lack of standing. *Soule*, 90 F.4th at 44; *see* Non-Employer Br. 14; Employer Br. 15.

However, repeating the district court's error, A-59–A-60, Defendants insist that "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Non-Employer Br. 14 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)); Employer Br. 15 (same). *Morrison* is not the proper standard for facial Rule 12(b)(1) motions based, as here, on the allegations of the complaint and exhibits attached to it. Opening Br. 12–13. For such facial Rule 12(b)(1) motions, this Court has consistently ruled that "the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see also*

3

*Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533 (2d Cir. 2020) (quoting *Carter*, 822 F.3d at 56–57); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 154 n.4 (E.D.N.Y. 2018) (collecting cases where this Court has applied the *Carter* standard to facial standing challenges rather than the *Morrison* standard). "The task of" this Court "is to determine whether" Plaintiff "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter*, 822 F.3d at 56 (cleaned up). The Court must construe the complaint and attached exhibits in Plaintiff Harker's favor, "accepting all material factual allegations as true" and "draw[ing] all reasonable inferences in favor of" Harker. *Soule*, 90 F.4th at 44, 48; *see Carter*, 822 F.3d at 57.

Defendants have not disputed that their Rule 12(b)(1) motions were facial ones, so the proper standard is the one this Court articulated in *Carter*.

## ARGUMENT

### I. Harker Has Standing To Bring His Discrimination Claims.

Harker plausibly alleged facts sufficient to establish that he has standing to sue. He has established each of the three elements of Article III standing. First, Harker "suffered an injury in fact" as he was racially stigmatized and excluded from the better-paying DTL gaffer position on the 2022 Meta production and from all DTL positions on subsequent productions. *Soule*, 90 F.4th at 45 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Second, such injury "'is fairly traceable'

4

to Defendants' challenged conduct" in conspiring to implement the expressly racially discriminatory Double the Line initiative. *Id.* (quoting *Spokeo*, 578 U.S. at 338). And third, Harker's injury "is likely to be redressed by a favorable judicial decision," namely an award of damages and declaratory and injunctive relief against Defendants and their discriminatory initiative. *Id.* (quoting *Spokeo*, 578 U.S. at 338).

### A. Harker plausibly alleged injury in fact.

Harker has pleaded concrete, particularized, and actual injuries in fact. Excluded from the DTL gaffer position for the December 2022 Meta production, Harker earned less money in the best boy position, the only position that Something Ideal offered him. A-30 ¶ 130; A-33 ¶ 153. Harker has suffered further loss of employment and wages as Defendants continue to exclude him from all DTL positions on subsequent projects due to the color of his skin. A-24 ¶ 89. Such "loss of employment and the resulting loss of wages and other benefits" are "classic and paradigmatic injuries for standing purposes." *DiCocco v. Garland*, 52 F.4th 588, 591–92 (4th Cir. 2022) (quotation omitted); *see also Carter*, 822 F.3d at 55 ("Any monetary loss suffered by the plaintiff suffices for this element; even a small financial loss suffices." (quotation omitted)). Harker also suffered stigmatization and reputational harm from being subjected to the racially discriminatory Double the Line initiative, "intangible harms" that are "traditionally recognized as providing a basis for lawsuits in American courts." *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th

5

276, 284 (2d Cir. 2023) (quotation omitted). Harker "is not simply policing legal infractions in the abstract." *Guthrie v. Rainbow Fencing, Inc.*, 113 F.4th 300, 309–10 (2d Cir. 2024). He is an experienced motion picture lighting technician who has been injured in fact. *See* Opening Br. 13–15.

The Non-Employer Defendants have nothing to say about these injuries in fact other than that they are "nothing more than a generalized grievance," Non-Employer Br. 20, while Something Ideal dismisses these harms as mere "potential damages," Employer Br. 19. Not so. Financial, stigmatizing, and reputational harms are "classic and paradigmatic form[s] of injury in fact." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017). This is not "legal hopscotch." Employer Br. 19. Article III standing first requires injury in fact, and Harker has plausibly alleged such injury.

**B.** **Harker plausibly alleged his injuries are fairly traceable to Defendants' challenged conduct.**

**1.** **Harker plausibly alleged traceability.**

The lion's share of Defendants' standing arguments are directed at traceability for injuries Harker suffered when they excluded him from the DTL gaffer position on the 2022 Meta production. *See* Employer Br. 17 (citing *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)); Non-Employer Br. 16 (same). *Jackson-Bey* is a case that "sounds in traceability," Opening Br. 15–16 (quoting *Antonyuk v. James*, 120 F.4th 941, 978 n.21 (2d Cir. 2024)).

6

Defendants virtually ignore that Harker is suing not just over the 2022 Meta production but also over *all* DTL positions that he was not offered on subsequent productions. *Compare* A-25 ¶ 101 ("Defendants conspired and contracted to implement the DTL initiative and to deny and continue to deny Mr. Harker the opportunity to contract for available positions for which we was willing and qualified to do so."), *with* Employer Br. 6 ("Harker's claims arise from the alleged hiring practices for a commercial production project for Defendant-Appellee Meta Platforms, Inc. . . . on December 14, 2022."); Non-Employer Br. 5 ("This lawsuit is based on the hiring process for a single Meta commercial that was made on December 14, 2022."). Harker's injuries, both at the 2022 Meta production and for subsequent productions, were traceable to the Defendants conspiring and contracting to racially discriminate against him with their Double the Line initiative. Harker's injuries did not "result[] from his own decision not to follow [] simple procedure[s]." *Jackson-Bey*, 115 F.3d at 1095. There were no procedures to follow, and the DTL positions automatically excluded Harker because he is white.

The Double the Line Initiative, which Defendants have expressly limited to BIPOC individuals, is unlike the prison policy that the prisoner attempted to challenge in *Jackson-Bey*. In that case, the prison provided a process for inmates to register their religious affiliation. *Id.* at 1096. "This ha[d] significance because prison officials are not required to accommodate an inmate's religious demands

7

without regard to whether or not the inmate is actually a member of the religion." *Id.* at 1096–97. Without submitting to this established process, an inmate sued on the theory that the prison would not accommodate his religious sect. But it was "not at all clear that the [religious] sect would not have been accommodated had Jackson-Bey registered and formally brought the subject to the attention of" prison officials. *Id.* at 1097 (indicating that "the subsequent actions of prison officials" in fact "point[ed] to the contrary conclusion").

Here, however, there is no question that the color of Harker's skin disqualifies him from the Double the Line initiative. A-14 ¶¶ 22–23 (Defendant AICP explaining that Double the Line participants "agree to cover the costs to hire a BIPOC candidate to work alongside the chosen role"); *see also* Employer Br. 5 (acknowledging the Double the Line initiative requires hiring a "Black, Indigenous, or Person of Color ('BIPOC')" into DTL positions); Non-Employer Br. 1 (agreeing at least that the Double the Line initiative is only for "Black, Indigenous, and People of Color ('BIPOC') crew members"). The DTL employees on the 2022 Meta production had only one characteristic in common: their BIPOC status. A-23 ¶ 82.

Nor is there any possible way for Harker to apply for DTL positions. As is standard industry practice, Something Ideal does not provide any application for any production or position. AA-43 ¶¶ 3–4, 6. Instead, the production company initiates contact with prospective employees to offer them specific work in accordance with

8

standard industry practice. A-31 ¶ 137; A-43 ¶ 4. For the DTL positions, on the other hand, Something Ideal removed from its internal "applicant pool" all non-BIPOC individuals, such as Harker, and then used that racially discriminatory pool to offer DTL positions only to BIPOC individuals. A-30–A-31 ¶¶ 134–35, 138–40. In implementing Defendants' expressly racially discriminatory Double the Line initiative, Something Ideal "refuse[s] to accept applications for positions" and instead "hand-pick[s] individuals for" unposted positions "without considering applicants." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).

*Petrosino* was designed for cases such as this one. 385 F.3d at 227 (citing *Brown*, 163 F.3d at 710 n.2 (noting that, "[i]n each case in which a formal application was not required by a court, the position was not posted *and* either the employee had no knowledge of the position, or the employee made an effort to apply for the specific position through an informal procedure endorsed by the employer")). Under *Petrosino*, a plaintiff does not need to allege applying for job openings when "the vacancy at issue was not posted" and when the plaintiff "*either* had (a) no knowledge of the vacancy before it was filled *or* (b) attempted to apply for it through informal procedures endorsed by the employer." 385 F.3d at 227 (emphases added). *Petrosino* does not require a "substantial showing that application . . . would have been futile." *Jackson-Bey*, 115 F.3d at 1096.

9

Defendants disagree that hiring for the Double the Line initiative should be subject to *Petrosino* and instead ask the Court to limit *Petrosino* to the facts of "failure-to-promote cases." Non-Employer Br. 24. In their telling, racially discriminating employers are immune from suit if they succeed in keeping the targets of discrimination unaware of the positions until after they are filled. *See* Non-Employer Br. 20 (arguing that the "admission is itself fatal" that "Harker was unaware of the [DTL gaffer] position" on the 2022 Meta production "and so did not apply for it"). The Court should not accept such an invitation. The rule developed in *Petrosino* and *Brown* applies just as well to hiring cases. *See Brown*, 163 F.3d at 710 n.2 (citing *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 349 (3d Cir. 1990) (applying this principle in the context of hiring new employees)). Indeed, "relaxation of the application" requirement "is especially appropriate when the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect." *Metal Serv. Co.*, 892 F.2d at 349.

Here, the Double the Line initiative is not simply "suspect." *Id.* It is expressly racially discriminatory. Defendants—sophisticated business entities—attempt to win sympathy for their blatant racial discrimination against white men and women by comparing themselves to "[s]mall mom-and-pop shops who offered a stockroom job to a neighborhood teenager." Non-Employer Br. 25. If Congress wants to exclude small businesses from the reach of federal antidiscrimination laws, then

10

Congress knows how to do so. *E.g.*, 42 U.S.C. § 2000e(b) (defining employer as "a person engaged in an industry affecting commerce who has fifteen or more employees"). But companies covered by those laws know full well that secretive or "word-of-mouth hiring methods" are "suspect because of their propensity for 'masking racial bias.'" *Grant*, 635 F.2d at 1016 (quoting *Barnett v. W.T. Grant Co.*, 518 F.2d 543, 550 (4th Cir. 1975)). Defendants have not even masked their racial discrimination. They have conspired to intentionally discriminate against white individuals such as Harker and exclude them from all DTL positions.

### 2. Harker satisfies both *Petrosino* options.

Application of *Petrosino* to the facts of this case is straightforward. None of the DTL positions were posted. *See* Employer Br. 25 (acknowledging this fact). Harker was unaware of the Double the Line initiative's existence until all the DTL positions for the 2022 Meta production had already been filled. *See* Employer Br. 25; Non-Employer Br. 26. And Harker remained ignorant of DTL positions after the Meta production because Defendants do not publicize those positions in advance either. *See* A-24 ¶ 89; A-29 ¶ 126; A-43 ¶ 4; *see also* Non-Employer Brief 25 (complaining, despite the significant financial resources they have spent to support, sponsor, and fund the Double the Line initiative, that it would be too "burdensome" for the companies to post the short-term positions instead of offering them directly to BIPOC individuals). Harker thus satisfied the first option under *Petrosino* for the

11

Meta production because he had "no knowledge of the vacancy before it was filled." 385 F.3d at 227.

Defendants, of course, disagree. Insisting Harker should have submitted a nonexistent application for the DTL gaffer position which he had no knowledge of before the 2022 Meta production, Defendants cite cases involving individuals who chose not to apply for admission to static entities such as a local chapter of the Moose Lodge, *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), or for appointment to well-publicized judicial vacancies, *Carney v. Adams*, 592 U.S. 53 (2020). For the DTL positions, Defendants have not provided an application process at all, unlike the state-issued mental health counseling licenses, *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023), or civil service positions, *Abadi v. City of New York*, No. 22-1560, 2023 WL 3295949 (2d Cir. May 8, 2023), that they erroneously claim are comparable to the unposted DTL positions. Defendants have chosen not to provide an application process for the DTL vacancies or any others. Instead, Defendants keep Harker and all other potential white employees in the dark about those DTL positions until after the production company fills them exclusively with BIPOC individuals.

Succeeding under that first *Petrosino* option is enough for Harker to plausibly allege traceability, but he also satisfies the second option of using "informal procedures endorsed by the employer." 385 F.3d at 227. There was, of course, no application process for any position on the December 2022 production or on any

12

subsequent production. Nevertheless, Something Ideal knew Harker has "substantial industry experience" as an electrical technician and had "prior work for Something Ideal." Employer Br. 12. The production company even entered into a settlement agreement with the National Labor Relations Board "under which Something Ideal agreed to offer him electrician positions on future commercial productions." Employer Br. 18 (citing SA-25–33).[1] And Something Ideal offered Harker the best boy electrician position on the 2022 Meta production, "which, absent racial discrimination, should have made Harker a natural candidate for the second gaffer position." Opening Br. 20. Something Ideal still has not provided any reason why, other than the racially discriminatory requirements of the Double the Line Initiative, it did not offer Harker the DTL gaffer position on the 2022 production and has not offered him any DTL electrical technician position since.

Something Ideal instead tries to fault Harker for not applying for the 2022 Meta production's non-DTL gaffer position that it admits the company "had already hired when it offered Harker the Best Boy position for the Commercial." Employer Br. 28.[2] Harker's desire for the DTL gaffer position was not "contrived." Employer

---

[1] Something Ideal inaccurately asserts that Harker himself entered into this settlement agreement. Employer Br. 40. While Harker was the beneficiary of the agreement, the settlement agreement was between Something Ideal and the NLRB. *See* SA-29–30 (lacking Harker's signature but including signature of Something Ideal's representative).

[2] The other Defendants argue the Court should not consider this fact at all. Non-Employer Br. 27–28. But as Harker explained below, the email he filed

Br. 18. The position would have provided better compensation and experience than the best boy electrician position Something Ideal offered Harker. Even so, as the Supreme Court has made clear, "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *FEC v. Cruz*, 596 U.S. 289, 297 (2022).

The non-DTL gaffer and the DTL gaffer positions are not the same position. *Contra* Non-Employer Br. 23 n.2. The non-DTL gaffer is what most productions simply call "the gaffer." The gaffer is "*the* most senior or highest-level electrician on a production." A-17 ¶ 35 (emphasis added); *see also* SA-26 (mentioning "the Gaffer/Department Head"); Employer Br. 18 (citing SA-26 but excising the word "the"). The gaffer position requires a high level of expertise and experience. Even Harker, with his many years in the commercial production industry, "has primarily worked in lower electrical positions on set during his career, such as electrician, best boy electrician, and generator operator" rather than as a gaffer. A-18 ¶ 37. Harker's limited gaffer experience is also presumably why "the Gaffer/Department Head" is

---

documenting this fact, A-48–50, was part of the pleadings because this Court has ruled that a complaint includes "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Patane v. Clark*, 508 F.3d 106, 111 n.2 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)). Nevertheless, the Court does not need to consider this fact, which Something Ideal itself acknowledges as true, to rule in Harker's favor.

the only position "in the electrical department" that Something Ideal did not promise the NLRB it would hire Harker for. SA-26.

The DTL gaffer position is another story. Outside of the Double the Line initiative, commercial productions do not have a DTL gaffer. The DTL gaffer on the 2022 Meta production "lacked experience as a gaffer" and could not "even properly coil an electric extension cord, which is among the most basic skills of any motion picture electrician." A-19 ¶¶ 47–48. The DTL gaffer would not be qualified as a non-DTL gaffer or even as a non-DTL electrician. A-44 ¶ 17. Experience, or lack thereof, was not a requirement for the DTL positions. Some DTL employees were highly qualified and operated without supervision. A-45–47 ¶¶ 19–36, 41–42. Others, like the DTL gaffer, were not qualified. A-46–47 ¶¶ 37–40. The connecting thread for the DTL employees is what truly set the DTL positions apart from the non-DTL positions: their BIPOC status. A-23 ¶ 82.

Were it not for Harker's race, Harker would have been the logical choice for filling the 2022 Meta production's DTL gaffer position, which would have given Harker experience behind the non-DTL gaffer and been more financially rewarding than his best boy position. Something Ideal has no explanation why it has not offered him even a DTL best boy or DTL electrician position since then. And Harker did not need to allege that, but for Defendants' discrimination, he would have actually obtained the DTL positions. *See Ne. Fla. Ch. of Assoc. Gen. Contractors v. City of*

15

*Jacksonville*, 508 U.S. 656, 665–66 (1993). All he needed to allege for standing was that Defendants erected discriminatory barriers to prevent white individuals such as Harker from obtaining the DTL positions. *Id.*; *see also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (ruling that "to establish standing to challenge an allegedly discriminatory program," "a plaintiff need only demonstrate that they are able and ready to apply, but a discriminatory policy prevents them from doing so on an equal footing"). Harker is able and ready to serve in the DTL positions, but Defendants have already disqualified him from those positions because he is white.

### 3. Defendants' remaining traceability arguments are meritless.

The Non-Employer Defendants concoct several other reasons why they think Harker has not satisfied *Petrosino*.

First, similar to Something Ideal, the Non-Employer Defendants say that Harker was "aware of the need to hire a gaffer more generally." Non-Employer Br. 26. But there is no general application process for commercial production positions. For the 2022 Meta production, Harker lacked knowledge of the vacancy that he was excluded from because of his race—the DTL gaffer position—until after the production had begun. *See* Non-Employer Br. 22 (conceding Harker "was *not* aware of the DTL program prior to the December 2022 commercial"). Harker did not even know about that Meta production until Something Ideal offered him the best boy position. Similarly, Harker lacked knowledge of subsequent DTL positions because

16

Defendants do not publicize those productions and DTL positions. *See* Non-Employer Br. 25.

If "a central purpose of the specific-application requirement is to put the employer on notice of the employee's interest in a position," Non-Employer Br. 23, then Something Ideal was well aware that Harker was interested in electrical technician positions.[3] Tellingly for the 2022 Meta production, using Non-Employer Defendants' own example, Harker is an individual who worked "with the particular production company . . . on the particular commercial." Non-Employer Br. 25. Despite Harker "frequently work[ing] with the defendant production company," Something Ideal has never offered Harker a single DTL position. Non-Employer Br. 26.

Second, the Non-Employer Defendants assert that *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), "has no relevance here, because it applies only where a plaintiff is *aware* of the position and can 'prov[e] that [they] would have applied for the job had it not been for'" the discriminatory practices.

---

[3] Non-Employer Defendants incorrectly assert that Harker had not raised until appeal the argument that Something Ideal already knew Harker was interested in filling motion picture electrical technician positions. Non-Employer Br. 29. Harker raised this argument below in his briefing, *e.g.*, Harker Br. Opposing Def. Something Ideal's Mot. to Dismiss, Doc. 46 at 13 (Jan. 25, 2024), and in the pleadings, *e.g.*, A-43 ¶¶ 3–5. Even if this were a new *Petrosino* argument, Harker could still raise it on appeal because it would be "a new argument to support what has been his consistent claim:" that Harker satisfies Article III standing requirements. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995).

Non-Employer Br. 22 (quoting *Teamsters*, 431 U.S. at 367–68). Defendants altogether miss the reasons why Harker cited *Teamsters* and how that case relates to *Petrosino*.

Fundamentally, *Teamsters* is an example of the Supreme Court not requiring plaintiffs to apply for positions before suing in federal court. *See* Opening Br. 16. Harker did not need to "subject[]" himself "to personal rebuffs" by applying for DTL positions once he learned about the Double the Line initiative at the 2022 Meta production. *Teamsters*, 431 U.S. at 365; *see also* Non-Employer Br. 23 (limiting Defendants' *Teamsters* argument to until the point when Harker obtained "knowledge of the DTL Program"). Defendants automatically exclude Harker from DTL positions because he is not BIPOC, just as certain employers used to post "sign[s] reading 'Whites Only' on the hiring-office door." *Teamsters*, 431 U.S. at 365. Applying for unposted DTL positions that have no application process and that all white men and women are automatically ineligible for would be no more than "a futile gesture." *Id.* at 365–66. Whether under *Petrosino* or *Teamsters* itself, the "manner in which" Defendants "publicize[] vacancies" and their "recruitment techniques" do not allow their racial discrimination to "escape[] the scrutiny of the federal courts." *Teamsters*, 431 U.S. at 365 & n.51.

And relevant for standing purposes, *Teamsters* is an example of a case about the merits of a Title VII employment discrimination claim, *id.* at 328, that subsequent

18

decisions have treated as authoritative for determining whether a plaintiff has Article III standing, Opening Br. 18–19 (collecting cases). Just as *Teamsters* provides insight into Article III, so does *Petrosino*. No Defendant argues otherwise.

Third, Non-Employer Defendants argue that "Harker fails to allege he was qualified for the DTL position." Non-Employer Br. 31–35. This assertion is hard to square with Harker's clear allegation that "[b]ut for his race, color, and national origin, Mr. Harker was qualified for the positions reserved by Defendants for 'BIPOC' individuals." A-27 ¶ 112.

Instead of accepting all material factual allegations as true" and "draw[ing] all reasonable inferences in favor of" Harker, *Soule*, 90 F.4th at 44, 48, Non-Employer Defendants repeat the district court's mistake of applying the wrong standard to their facial Rule 12(b)(1) motion, *see* Non-Employer Br. 14 ("jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it" (quoting *Morrison*, 547 F.3d at 170 )). Under the proper standard, Harker "has no evidentiary burden." *Carter*, 822 F.3d at 56. Harker "affirmatively and plausibly suggest[ed]," *id.*, that the Double the Line initiative was "a sham designed to justify statutory violations," A-25 ¶ 95. "Based on the very experienced DTL hires" for some positions "and the inexperienced hires to senior positions, such as the Gaffer-DTL, it was not" a genuine "apprenticeship program." A-24–25 ¶ 95.

19

Contrary to *Carter*, Non-Employer Defendants repeatedly belittle Harker's allegations about his "subjective" desire to gain experience as a gaffer, Non-Employer Br. 32, and Harker's "subjective" allegations that at least three of the DTL hires on the 2022 Meta production were experienced, Non-Employer Br. 33. Defendants do not know Harker's employment desires better than he does. And Harker did in fact point to "objective facts regarding" the other employees' experience. Non-Employer Br. 33; *see, e.g.*, A-47 ¶ 41 (observing that several DTL employees were so experienced that they did not need to "shadow their non-DTL equivalents"). Defendants do not even credit allegations Harker made about the experience level of a DTL electrician Harker personally worked with. A-46 ¶ 33.

Nor did Harker allege that Something Ideal merely "misapplied the program criteria." Non-Employer Br. 34. Harker alleged that all "Defendants conspired and contracted to implement the DTL initiative and to deny and continue to deny Mr. Harker the opportunity to contract for available positions for which he was willing and qualified to do so." A-27 ¶ 101. As Something Ideal's manager on the 2022 Meta production explained, "the DTL designation was related to a program run by the AICP" and "was required" for that production. A-23 ¶ 88. The amended complaint cited material from the websites Non-Employer Defendants maintained, but Harker was clear that he was "not asserting that the DTL program was or is an apprenticeship program" regardless of how Defendants describe it. A-24 ¶ 94.

20

Non-Employer Defendants may disagree with Harker's allegations. Nevertheless, Harker only has to "allege[] facts that affirmatively and plausibly suggest that" he "has standing to sue." *Carter*, 822 F.3d at 56. He does not need to affirmatively disprove every factual possibility.

Something Ideal, of course, is the entity that had direct responsibility for hiring individuals for DTL positions. But Non-Employer Defendants "conspired and contracted to implement the DTL initiative" in a racially discriminatory manner. A-27 ¶ 101. Harker's injuries from the racially discriminatory Double the Line initiative are thus traceable to Non-Employer Defendants' actions as well.

### C. Harker plausibly alleged his injuries are redressable through judicial relief.

Although the district court did not rule on redressability, the courts could redress Harker's past and ongoing injuries by awarding him damages and issuing declaratory and injunctive relief against Defendants and their racially discriminatory Double the Line initiative. *See Soule*, 90 F.4th at 47–48; *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024).

The only argument that either set of Defendants makes to the contrary is a cursory one that Non-Employer Defendants press for the first time on appeal. They argue Harker has no standing to seek prospective injunctive relief because he "primarily focuses on proving past injuries associated with the December 2022 commercial" and does not have "'concrete plans' to apply for a gaffer position."

21

Non-Employer Br. 35. As has been clear throughout Harker's pleadings and briefings in this case, Defendants continue to harm Harker by persistently excluding him from all DTL positions because he is white. *See, e.g.*, Opening Br. 3, 9, 15–16. There is no DTL or non-DTL gaffer application for Harker to submit because there is no application process at all. Nor is there any application for the other electrical technician positions that Harker would like to fill but which Defendants continue to conspire to exclude him from because of his race. Injunctive relief "'would at least partially redress' the alleged injury," so Harker has standing to obtain it. *Soule*, 90 F.4th at 48 (quoting *Meese v. Keene*, 481 U.S. 465, 476 (1987))

## II.  Harker Has Standing To Bring His Retaliation Claims.

Harker plausibly alleged facts sufficient to establish standing to bring the retaliation claims. *See* Opening Br. 24–25. All that Something Ideal has to say on this point is that the district court held that Harker "never alleged he expressed interest in the gaffer position"—presumably the DTL gaffer position—"*after* he learned of the DTL program." Employer Br. 22. To start, that the district court only mentioned the DTL gaffer position is emblematic of how it failed to devote a single line of its Memorandum Order to Harker's standing to bring his retaliation claims. *See* A-53–62. Harker alleged that Something Ideal retaliated against him by refusing to offer him any position whatsoever. *E.g.*, A-29 ¶ 126 ("After the December 14, 2022 Meta production, Something Ideal ceased to hire Mr. Harker for future

22

projects, thus refusing to contract with him based in part on his objection to the way Something Ideal was discriminating based on race.").

Before Harker objected to Defendants' racially discriminatory Double the Line initiative, Something Ideal hired Harker for (non-DTL) electrical technician positions, including the best boy electrician position on the Meta production. Something Ideal never required Harker to submit an application for those positions. A-43 ¶ 3. The production company even had a settlement agreement with the NLRB obligating the company to offer electrical technician positions to Harker. After Harker objected, however, Something Ideal has not offered him any position, in either its normal, non-DTL variety or in its DTL form. Harker had standing under either *Petrosino* option to pursue his retaliation claims. Opening Br. 24–25. Something Ideal simply ignores *Petrosino*'s application to Harker's retaliation claims. Employer Br. 22–23.

## III. The Court Should Not Rule on Something Ideal's Rule 12(b)(6) Issues.

The district court only ruled on Defendants' Rule 12(b)(1) motions. A-62–A-63. Harker appealed that decision and has only presented standing arguments. Rather than focusing on the standing issues in dispute in this appeal, Something Ideal devotes seventeen pages of its Argument section to whether Harker failed to state claims under Rule 12(b)(6). Employer Br. 23–40. Those issues are not properly before the Court. Failure-to-state-a-claim arguments are not an "alternative[]" basis

23

for affirming the grant of a motion to dismiss for lack of standing. Employer Br. 14 (citing *Chesley v. Union Carbide Corp.*, 927 F.2d 60 (2d Cir. 1991) (affirming dismissal for lack of jurisdiction with a different jurisdictional argument)).

Even if that were not so, this Court's normal practice when reversing a district court dismissal on standing grounds is to allow the district court to pass on the other issues "in the first instance" on remand. *Soule*, 90 F.4th at 42 (remanding for district court to "assess in the first instance whether Plaintiffs' complaint states a claim for a violation of Title IX"); *see also id.* at 74 n.5 (Pérez, J., concurring in part and dissenting in part) (agreeing that the "merits of Plaintiffs' Title IX claims are rightly a question for the district court in the first instance"); *New York ex. rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 284 (2d Cir. 2024) (declining "invitation" to "nonetheless affirm on the alternative basis that the Complaint fails to state a plausible Title IX claim"). Something Ideal has not identified any compelling reason for the Court to depart from its normal practice, and the other Defendants have not raised their Rule 12(b)(6) arguments on appeal.

Rather than briefing Something Ideal's assorted Rule 12(b)(6) issues within the condensed timing and truncated word limit of this Reply Brief, Harker requests that the Court follow its normal practice and allow the district court to consider Defendants Rule 12(b)(6) motions in the first instance on remand. If the Court

nevertheless desires to reach those issues, Harker requests that the Court grant him an opportunity to brief them.

## **CONCLUSION**

For the foregoing reasons, the district court's order and judgment granting Defendants' motions to dismiss should be reversed.

Dated: February 18, 2025      Respectfully submitted,

Ronald A. Berutti
**MURRAY-NOLAN**
**BERUTTI LLC**
30 Wall Street
8th Floor
New York, NY 10005
(212) 575-8500
ron@mnblawfirm.com

/s/ Clark Lassiter Hildabrand
**COOPER & KIRK, PLLC**
Clark Lassiter Hildabrand
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
Fax: (202) 220-9601
childabrand@cooperkirk.com

*Attorneys for Plaintiff-Appellant James Harker*

26

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(B) because this brief contains 5,943 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: February 18, 2025                    /s/ Clark Lassiter Hildabrand
                                            Clark Lassiter Hildabrand

                                            *Attorney for Plaintiff-Appellant*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of February 2025, I filed the foregoing Reply Brief via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.

Dated: February 18, 2025       <u>/s/ Clark Lassiter Hildabrand</u>
                                   Clark Lassiter Hildabrand

                                   *Attorney for Plaintiff-Appellant*